[844 NE2d 296, 810 NYS2d 749]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v HARRY J.F. BLOOMFIELD, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v STUART CREGGY, Respondent.

Argued January 5, 2006; decided February 14, 2006

## POINTS OF COUNSEL

*Robert M. Morgenthau, District Attorney,* New York City (*Gina Mignola* and *Amyjane Rettew* of counsel), for appellant. Contrary to the view of the Appellate Division, the evidence in this case was legally sufficient to establish that the fraudulent Charles Wilson cover-up letters were business records kept and maintained by the Westfield conspirators' shell companies. (*People v Rossey,* 89 NY2d 970; *People v Cabey,* 85 NY2d 417; *People v Williams,* 84 NY2d 925; *People v Wong,* 81 NY2d 600; *People v Santi,* 3 NY3d 234; *People v Taylor,* 94 NY2d 910; *People v Ficarrota,* 91 NY2d 244; *People v Chico,* 90 NY2d 585; *People v Bleakley,* 69 NY2d 490; *People v Barnes,* 50 NY2d 375.)

*Stillman & Friedman, P.C.,* New York City (*Nathaniel Z. Marmur* and *Karin Klapper Orenstein* of counsel), for Harry J.F. Bloomfield, respondent. The Appellate Division correctly determined that the 16 Charles Wilson letters were not "[b]usiness record[s]" under Penal Law § 175.00 (2) because they were not "kept or maintained" by the respective companies. (*People v Brown,* 140 App Div 591; *People ex rel. Isaacson v Fallon,* 202 NY 456; *People v Bel Air Equip. Corp.,* 46 AD2d 773, 39 NY2d 48; *People v Papatonis,* 243 AD2d 898; *People v Schwartz,* 21 AD3d 304; *Matter of Sharpton v Turner,* 170 AD2d 43; *People v Roman,* 149 Misc 2d 971; *People v Davis,* 49 NY2d 910; *United States v White,* 322 US 694; *People v DeLuca,* 178 AD2d 426.)

*Duane Morris, LLP,* Washington, D.C. (*Joseph J. Aronica* and *Laurice Chen* of counsel), for Stuart Creggy, respondent. The Appellate Division was correct in its reversal of the convictions below as any straightforward application of Penal Law § 175.00 clearly indicates that the 16 Charles Wilson letters found in Andrew Warren's "working notes" folder were not "kept or maintained by the 16 companies and did not meet the legal definition of "[b]usiness record[s]." (*People v Kennedy,* 68 NY2d 569; *People v Davis,* 49 NY2d 910; *People v Agha Hasan Abedi,* 156 Misc 2d 904; *People v Linardos,* 104 Misc 2d 56; *People v DeLuca,* 178 AD2d 426; *People v Bel Air Equip. Corp.,* 46 AD2d 773, 39 NY2d 48.)

**OPINION OF THE COURT**

CIPARICK, J.

The issue presented by this appeal is whether there is sufficient evidence that fraudulent letters kept in the files of an enterprise's legal counsel, rather than at the company's headquarters, were "[b]usiness record[s]" as defined by Penal Law § 175.00 (2). We conclude that the location where a document is maintained is merely a factor, not determinative, of its status as a business record under the statute, and that the People presented legally sufficient evidence to support the conclusion reached by the trier of fact.

In 1992, three brokers—the Westfield partners—engaged in fraudulent securities transactions. The scheme involved the sale of unregistered stock pursuant to Regulation S of the Securities Act of 1933. Regulation S securities generally sell at discounted prices since they may only be held by non-United States citizens who do not reside within the country. The Westfield partners, all United States citizens residing in the United States, devised a plan to buy and sell Regulation S securities by acting as foreigners. To facilitate these transactions, the Westfield partners contacted Andrew Warren, a London solicitor at the firm Talbot Creggy, located at 38 Queen Anne Street, to set up offshore shell corporations to appear as if they were owned by non-United States persons. Warren, at the request of the Westfield partners, established approximately 20 shell corporations and hired a management company, Channel Islands & International Law Trust Company, Ltd. (Management Company), located on the Isle of Jersey. Warren advised the Westfield partners that he would relay all stock transfer instructions to the Management Company and originally used the 38 Queen Anne Street address as the address for each of the shell corporations.

In 1994, after the Securities and Exchange Commission (SEC) had commenced an investigation into the Regulation S transactions, Warren sought advice on how to handle the situation from his senior partner, Stuart Creggy. In exchange for $23,000, Creggy offered to have a Liberian diplomat pose as the owner of the shell companies. Creggy, in turn contacted Harry J.F. Bloomfield, a Canadian lawyer, to retain the Liberian diplomat, Charles Wilson.

Wilson served as First Secretary and Consul at the Liberian Embassy in Ottawa. Due to the civil war in Liberia, Wilson's income was cut off. Communication with Liberia was also largely

disrupted and the embassy was forced to close. Wilson, who was ill, remained in Canada and sought refugee status along with his wife and children. Bloomfield served as Honorary Liberian Consul and frequently helped Wilson financially. Bloomfield referred to Wilson as being in a "constant state of penury" and used his good will and gifts of money to periodically influence Wilson for assistance. Wilson gave Bloomfield a copy of his passport to open an offshore bank account and signed various questionable documents in exchange for the support Bloomfield gave Wilson and his family.

In November 1994, Bloomfield sent Wilson a package with 16 letters to sign, each addressed to the directors of the 16 Westfield partners' shell corporations. Each letter read as follows:

> "Dear Sirs
>
> "This is to confirm in my capacity as beneficial owner of the share capital of this Company that you should at all times implement my directions relating to the affairs and conduct of the Company business and undertaking or such other person as I may from time to time nominate in writing.
>
> "Yours faithfully
>
> "Charles HNE Wilson."

Upon receipt of the letters, Wilson lay the letters aside until Bloomfield called a week or two later and assured him that they were "perfectly correct." In response, Wilson sent Bloomfield a letter stating that he was apprehensive about signing the letters and reminded Bloomfield that the latter had promised "never [to] mislead [him] nor talk [him] into anything illegal." Bloomfield returned the letter and envelope and wrote a note on it stating "Charles—attorney Creggy assures me that these are regular business accounts. I know him and trust him. Be assured that we will always try to protect your position." Bloomfield continued to call Wilson until he ultimately signed and returned the letters. The letters were then forwarded to Creggy in London.

Meanwhile, the Management Company had been repeatedly contacting Warren to learn the identity of the true owner. Initially Warren ignored the requests as to the identity of the owner, but in June 1995 he finally responded to the inquiry with a fax indicating that Wilson was the beneficial owner of the 16 corporations as well as others.

The SEC investigation continued. Warren responded to its inquiry by referring the request for information to England's Law Society "for their opinion as to disclosure on matters which touch upon professional confidence and privilege." He never responded further. The SEC ultimately referred the matter to the British regulatory agency, the Department of Trade and Industry (DTI) who in turn contacted Warren. In response, Warren supplied DTI with various files maintained in his office for each company which were then returned. These files did not contain the letters in question. DTI thereafter learned of Wilson's identity directly from the Management Company. After obtaining this information, the British police executed a search warrant for 38 Queen Anne Street where they seized documents. The officers questioned Creggy who denied knowledge of the subject companies and referred them to Warren. The officers then confronted Warren who handed over various documents. The documents taken from the office, in part, consisted of the files given to the DTI and an additional "working notes" file from Warren's secretary's office which contained, among other things, copies of the 16 executed Wilson ownership letters as well as unsigned draft copies. As a result of the investigation, Warren was extradited to the United States where he pleaded guilty to attempted enterprise corruption.

On April 3, 2001, Bloomfield and Creggy were each indicted on one count of conspiracy in the fifth degree in violation of Penal Law § 105.05 (1); 17 counts of falsifying business records in the first degree in violation of Penal Law § 175.10; two counts of criminal possession of a forged instrument in the first degree in violation of Penal Law § 170.30; and one count of criminal possession of forgery devices in violation of Penal Law § 170.40.

Supreme Court dismissed four counts of the indictment, which left 16 counts of falsifying business records in the first degree (E felonies) and one count of conspiracy in the fifth degree, all based upon the Wilson letters. Supreme Court rejected the argument, however, that the letters could not be business records since they were found in Warren's office, not at the enterprise. A bench trial before a different justice followed and Creggy and Bloomfield were each found guilty of the remaining 17 counts. Each was sentenced to 500 hours of community service, a $6,000 fine and five years' probation. On appeal, the Appellate Division unanimously reversed, on the law, and dismissed the indictment. A Judge of this Court granted leave to appeal and we now reverse.

In reversing Supreme Court, the Appellate Division wrote: "[Since] the letters were not held by the Management Company or in the records of the 16 individual companies, they were not 'kept or maintained' by these offshore corporations (the enterprise). Thus, they do not fit within the legal definition of '[b]usiness record' " (15 AD3d 302, 304 [2005]). The People contend that the Appellate Division applied an unduly restrictive reading of Penal Law § 175.10 by placing emphasis on the location of the documents, which neither the plain language of the statute nor case law supports. We agree.

The only issue we are asked to decide is whether the People presented legally sufficient evidence to support the conclusion that the 16 letters fit within the definition of "business records." Penal Law § 175.10, falsifying business records in the first degree, (1) incorporates the elements of Penal Law § 175.05 (falsifying business records in the second degree—"[a] person is guilty of falsifying business records in the second degree when, with intent to defraud, he . . . [m]akes or causes a false entry in the business records of an enterprise") and (2) provides further that the "intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof." "Business record" is defined as "any writing or article . . . maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity" (Penal Law § 175.00 [2]). "Enterprise" is defined as "any entity of one or more persons . . . engaged in business, commercial [or] professional . . . activity" (Penal Law § 175.00 [1]).

"Where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning" (*Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals of Town of Huntington*, 97 NY2d 86, 91 [2001]). The statute at issue does not refer to the location of the records. Thus, contrary to the Appellate Division's holding, the actual location of the records is not dispositive as to whether the documents are business records under Penal Law § 175.00. Instead, location is merely a factor for the trier of fact to consider in determining whether the purpose of the records is to reflect or evidence the "condition or activity" of the enterprise. Certainly a document purporting to state the identity of the owner of a company could reflect or evidence the "condition" of that enterprise.

We further reject defendant Bloomfield's argument that false documents created and held for the purpose of deceiving outside third parties do not qualify as business records and reject the

insider/outsider distinction. It is clear that the Legislature, in enacting section 175.00 *et seq.*, intended to protect outsiders, as well as insiders, from fraudulent falsification of an enterprise's records.

Here, there was evidence adduced at trial that demonstrated that the Management Company did not generally keep ownership records for these corporations (they were kept at the law office) but instead focused on processing corporate transactions. There was further evidence that the Management Company had been informed by the companies' corporate attorney and business agent, Warren, that Wilson was the actual beneficial owner of the corporations even though the corporations were really owned by the Westfield partners. Supreme Court could reasonably have inferred that Warren and Creggy's roles were not solely as counsel but also as management as they served as an integral part of the enterprise.

In conclusion, there was a valid line of reasoning and permissible inference by which to hold that the letters signed by Wilson and fashioned by Warren, Bloomfield and Creggy were produced for the "purpose of evidencing or reflecting [the enterprise's] condition"—that the corporations were owned by a foreigner, a condition essential to the illicit scheme. To apply the statute in any other way would undermine its purpose by inviting purveyors of fraudulent corporate documents to seek refuge in the filing cabinets of their attorneys.

Accordingly, the order of the Appellate Division should be reversed and the case remitted to the Appellate Division for consideration of the facts.

Chief Judge KAYE and Judges G.B. SMITH, ROSENBLATT, GRAFFEO and R.S. SMITH concur; Judge READ taking no part.

Order reversed and case remitted to the Appellate Division, First Department, for consideration of the facts (*see* CPL 470.25 [2] [d]; 470.40 [2] [b]).